[No. 28838. Department Two. January 16, 1943.]

P. CHEBALGOITY, *Respondent*, v. WILL BRANUM, *as Executor of the Will of Laura A. Branum, Deceased, and as Administrator of the Estate of Champ Branum, Deceased, Appellant.*[1]

[1]Reported in 133 P. (2d) 288.

252

*L. B. Vincent,* for appellant.

*Roberts, Swanson & Tunstall,* for respondent.

BLAKE, J.—Plaintiff brought this action for reformation of a real estate contract pertaining to a lot in the city of Yakima. From judgment granting the relief sought, defendant appeals.

Appellant is the personal representative of Laura A. Branum and Champ Branum, who were the owners of the real property in controversy. In September, 1932, they borrowed six hundred dollars from respondent, Chebalgoity, to secure which they executed and delivered a mortgage on the property. In December, 1933, having defaulted in payments due under the mortgage, they entered into a contract with Chebalgoity, in terms as follows:

"IT IS HEREBY MUTUALLY AGREED by and between Champ Branum and Laura A. Branum his wife, as Parties of the first part, and P. Chebalgoity, a bachelor, the party of the second part, all of said parties being residents of the County of Yakima, and State of Washington; that,

"WHEREAS, the said first parties are the owners of the legal title to the lands and premises hereinafter described; that they are people well along in years, and that they are indebted to the party of the second part by reason of the fact that said second party holds a mortgage against the said parties of the first part, in the sum of Six Hundred ($600.00) dollars,

"AND WHEREAS, said second party, because of the age and financial condition of said Parties of the first

part, does not desire to foreclose said mortgage, and thus deprive these parties of a home:

"Now THEREFORE IT IS HEREBY MUTUALLY AGREED, by and between the parties to this contract, that in order that the said parties of the first part may have a home, the said parties of the first part hereby agree to make and execute a good and sufficient Warranty deed to the property hereinafter described, the said deed to be held in escrow and not to be filed of record, and the said first parties hereby agree to make the second party herein the grantee in said deed; and it is further understood and agreed that said first parties, Champ Branum and Laura A. Branum agree to sell and convey the said property which is particularly described as follows:

"Lot Nine (9) in Block Thirty-Six (36), Original Townsite to the City of Yakima, formerly North Yakima, Washington, according to the plat thereof on file and of record in the office of the auditor of Yakima county, State of Washington,

"To the said party of the second part, P. Chebalgoity; and to pay to the said P. Chebalgoity the sum of Five ($5.00) dollars each and every month, commencing on the first day of January, 1934, and to continue the payment of said sum of $5.00 dollars per month each and every month thereafter, without interest, for a period of Fifteen years; or so long as said parties of the first part or either of them live. And in case of the death of both of said first parties, to-wit: Champ Branum and Laura A. Branum, before the expiration of the 15 year period; then and in that event the deed to said property, heretofore mentioned, shall be delivered to the said P. Chebalgoity, and said premises are to become the property of the said P. Chebalgoity, in fee simple.

"IT IS FURTHER AGREED that the said first parties, Champ Branum and Laura A. Branum, further agree that they will pay the taxes and assessments on the property while they live thereon.

"AND AT THE EXPIRATION of fifteen years, should said first parties still be living, they hereby agree that the deed heretofore mentioned, shall then be delivered to the said P. Chebalgoity, and said property then

becomes the property of said P. Chebalgoity, his heirs or assigns. Provided that in case the said first parties should at any time during the continuance of this contract become delinquent for a period of two years or more, in the payment of either the monthly payments or the taxes as herein mentioned, then the said second party shall have the right to foreclose said mortgage."

At the same time, they executed and delivered a deed to Chebalgoity. He retained possession of the deed until March, 1935, when he delivered it, with an executed copy of the contract, "in escrow" with the National Bank of Commerce at Yakima. There it remained until the trial of this case.

Champ Branum died in 1941. The administrator of his estate signified an intention of refinancing the "indebtedness" to Chebalgoity, whereupon the latter brought this action against the administrator and Laura Branum, who died shortly after trial, for reformation of the contract of December, 1933.

■ Respondent alleged, in effect, that the true intent of the parties in entering into the contract was that, in consideration of the relinquishment of his rights under the mortgage, the property be conveyed to him subject to the reservation of life estates in Champ and Laura Branum. Appellant contends that the contract and delivery of deed pursuant to it amounted to nothing more than an extension of the mortgage debt. We think this is manifest. Indeed, respondent, by necessary implication, concedes such effect to the transaction in bringing this action to reform the contract. However, such concession does not preclude reformation of the contract on the ground of mutual mistake. 53 C. J. 925, § 34. 23 R. C. L. 326, § 19. *Jenkins v. Jenkins University*, 17 Wash. 160, 49 Pac. 247, 50 Pac. 785; *Dennis v. Northern Pac. R. Co.*,

20 Wash. 320, 55 Pac. 210; *State v. Lorenz,* 22 Wash. 289, 60 Pac. 644; *Silbon v. Pacific Brewing & Malting Co.,* 72 Wash. 13, 129 Pac. 581; *Hendrickson v. Lyons,* 121 Wash. 632, 209 Pac. 1095; *Hazard v. Warner,* 122 Wash. 687, 211 Pac. 732, 31 A. L. R. 381; *Fay v. Best,* 137 Wash. 1, 241 Pac. 354.

In *Hendrickson v. Lyons, supra,* the court said, p. 635:

"It is undoubtedly a general rule that equity will not grant relief against mistakes of law, but the rule, like many others, has its exceptions, and we are clear that the case here is within an exception. As was said by the supreme court of the United States in *Hunt v. Rousmaniere,* 1 Pet. (U. S.) 1:

" 'When an instrument is drawn and executed, which professes, or is intended, to carry into execution an agreement, whether in writing or by parol, previously entered into; but which, by mistake of the draftsman, either as to fact or law, does not fulfill, or which violates, the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement.' "

There is no doubt about the right of respondent to maintain the action against the personal representative of the Branums. 24 Am. & Eng. Ency. of Law, p. 655, § 6; 53 C. J. 982, § 130. Nor is his right to maintain it impaired by lapse of time, for the bar of the statute of limitations does not begin to run until the assertion of an adverse claim against the party seeking reformation. *State v. Lorenz, supra.*

The burden is upon respondent, however, of establishing mutual mistake by evidence that is clear, cogent, and convincing. *Fay v. Best, supra.* So, the question for determination resolves itself into the sufficiency of respondent's evidence; for, owing to the death of Champ Branum and the physical disability of Mrs. Branum at the time of trial, appellant could

present no extraneous evidence of their intent in entering into the contract. Presumably, the contract bespoke their intent. And, in support of such intent, appellant points out that the mortgage of 1932 was never released of record; and that the value of the property in December, 1933, was $2,500. The former factor is, of course, evidence of a continuation of the debtor-creditor relationship established by the mortgage; the second *tends* to show a wide discrepancy between the consideration for the conveyance (six hundred dollars) and the actual value of the property—refuting an inference of intent to convey. *Pittwood v. Spokane Savings & Loan Society*, 141 Wash. 229, 251 Pac. 283.

On the other hand, the Branums were allowed to occupy the premises as long as they lived, notwithstanding their failure to comply fully with the requirements of the contract for the payment of taxes and five dollars a month. Chebalgoity paid the taxes, and the Branums paid him less than $350 up to the time of Champ Branum's death, yet Chebalgoity took no steps toward the foreclosure of the mortgage. Although the mortgage was never released of record, there can be no question that his understanding of the transaction was that he was to have the property, subject to a life estate in Champ and Laura Branum, in consideration of relinquishment of his rights under it. The question is whether he has established by clear and convincing evidence that that was also the Branums' understanding.

The transaction was negotiated by one Fred Martin, acting as intermediary for both parties to the contract. After the parties had been brought together and had come to an agreement, Martin undertook to communicate the terms of the agreement to a lawyer. The latter drew the contract in controversy. After drawing it,

Martin took the lawyer to the Branums, whom he met for the first time. Of what then transpired, he testified:

"Q. And what was the conversation at the time that you were down there? A. That's a long time. I wouldn't know exactly. I think likely that they wanted me to explain what I thought the contract meant and that I did. Q. And what did you explain to them? A. Well, I said—MR. VINCENT: Just a moment, your Honor. The witness already said he couldn't remember that long ago just what was said. THE WITNESS: No, I couldn't remember just word for word what was said, no. Q. You know the intent of the contract? A. I know the intent of the contract was that they should give these old folks a home as long as they lived. MR. VINCENT: I am objecting to that, the intent of the contract; that speaks for itself. THE COURT: He may state in substance what he said to the Branums. That is what the question called for. MR. SWANSON: Yes. A. What I stated to them—that this protected them in a home as long as they lived, that was what was the intent of the contract. Q. That is what you said to them? A. Of course, I might not be lawyer enough to know. THE COURT: What did you say to the Branums? THE WITNESS: I told them the intent of the contract was that this contract provided that they could live there in that home as long as they both lived, and, when that happened, this deed would, of course, naturally go to Mr. Chebalgoity, which the deed is drawn, I understand, and delivered to the bank. I had nothing to do with the escrow agreement that I recall, but Mr. Martin did. He took it over— MR. VINCENT: Just a minute. THE COURT: Read what the witness said. (Last answer read by the reporter.) Q. This may be a little leading: Do you mean to say that when they both died the deed went to Mr. Chebalgoity? A. That's what I intended to say, when they both were dead the property would belong to Mr. Chebalgoity. Q. You mean that's what you told the Branums? A. That's what I think I told them. I aimed to tell them just what that contract

meant. Q. Yes. A. Yes. Q. And, regardless of what the contract meant, that's what you did tell them? A. Yes—well, that's as near as I can remember, that's true. Q. You told them when they both died this would be Mr. Chebalgoity's property? A. Yes. MR. VINCENT: That has been asked and answered.

"Q. What did they say? A. Well, they said that that was what they wanted, or words to that effect. I asked them if it suited them and they said it was what they wanted. Q. And then was the contract signed? A. Then they signed it, yes."

Chebalgoity, Martin, and another witness, the disinterestedness of whose testimony is not so clear, testified to the same effect. Taking the record as a whole, we think the trial court was fully warranted in finding a mutual mistake had been made, and in reforming the contract.

Judgment affirmed.

SIMPSON, C. J., ROBINSON, and BEALS, JJ., concur.

March 17, 1943. Petition for rehearing denied.